IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

PASSAUER V. KELLEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KATHRYN J. PASSAUER, APPELLEE,

V.

SAMUEL G. KELLEY, APPELLANT.

Filed December 29, 2015.    No. A-14-1007.

Appeal from the District Court for Lancaster County: STEVEN D. BURNS, Judge. Affirmed as modified.

Andrew M. Ferguson, of Carlson & Burnett, L.L.P., for appellant.

No appearance for appellee.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

BISHOP, Judge.

Samuel G. Kelley appeals from the decree of dissolution of marriage entered in the district court for Lancaster County, Nebraska, dissolving his marriage to Kathryn J. Passauer, formerly known as Kathryn J. Kelley. He argues the court abused its discretion by (1) using both basic custody and joint physical custody calculations as a deviation when setting Kathryn's child support obligation, and (2) using his earning capacity rather than his actual income when calculating child support. He also appeals the alimony awarded to Kathryn. We determine the court abused its discretion in deviating from the child support guidelines in the manner it did, and in failing to give Samuel credit for past alimony paid. We modify the child support award, and also modify the duration of the alimony award to reflect credit for Samuel's payment of past alimony; judgment affirmed as modified.

- 1 -

BACKGROUND

Samuel and Kathryn were married in February 2000 in Gretna, Nebraska. They had two sons, one born in 1998 and the other in 2001. On September 30, 2009, Kathryn filed a petition for dissolution of marriage in the district court for Sarpy County, Nebraska. On July 6, 2011, the district court for Sarpy County entered a decree of dissolution of marriage, granting the parties joint legal custody of the children but placing physical custody with Samuel. The court did not award child support, but ordered Samuel to pay Kathryn alimony of $500 per month for 3 years. Kathryn appealed the decree, which this court vacated in an unpublished opinion filed on November 20, 2012. *Passauer v. Kelley*, No. A-11-681, 2012 WL 5870592 (Neb. App. Nov. 20, 2012) (selected for posting to court Web site). We determined the district court lacked jurisdiction because the record did not establish that Kathryn resided in Sarpy County at the time she filed her petition. *Id*.

On December 10, 2012, Kathryn again petitioned for dissolution of marriage, this time in Washington County, Nebraska, where she resided at that time. Samuel resided with the children at his mother's house in Lancaster County; on Samuel's motion, the action was transferred to the district court for Lancaster County. On May 10, 2013, the district court for Lancaster County granted Samuel temporary physical custody of the children and ordered Kathryn to pay $500 per month in temporary child support.

The matter proceeded to a bench trial on April 11 and June 16, 2014. Kathryn testified that during the marriage, she operated an in-home daycare until 2006. When she and Samuel separated in September 2009, she was not employed. She then worked performing maintenance at an apartment complex from June or July 2011 until April 2012. She earned $10 per hour but worked only 14 hours per month; she received her compensation in the form of a discount on her rent. From November 2012 to June 2013 (although she testified to these dates, the W-2s received in evidence suggest the dates were November 2011 to June 2012), she worked as a detailer for an auto dealership in Blair, Nebraska, earning $12 per hour and working 40 to 45 hours per week. From "September" (she did not specify the year, but the W-2s received in evidence suggest it was 2012) until August 1, 2013, she worked as a "forklift tech" for a company in Blair earning $12.50 per hour and working 40 hours per week. At the time of trial, she was "on lay-off" from the company in Blair. Kathryn also received $2,064 in unemployment compensation in 2013. In March 2014, only one month prior to trial, she began working as a "forklift tech" for a temporary employment agency, earning $13 per hour and working 32 to 40 hours per week.

Kathryn's W-2s for 2011 through 2013, one paystub from the temporary employment agency, and her income tax returns for 2011 and 2012 were received in evidence. The W-2s for the auto dealership showed $5,472.56 in wages for 2011 and $11,522.80 for 2012; the W-2s from the company in Blair showed $6,757.74 in wages for 2012 and $15,795.50 for 2013; the paystub dated March 21, 2014, from the temporary employment agency showed year-to-date earnings of $1,654.32. Kathryn's income tax returns showed gross income of $8,679 for 2011 and $20,349 for 2012. A summary of Kathryn's monthly living expenses was received in evidence and showed expenses totaling between $2,272 and $2,372, including her $500 temporary child support obligation.

Samuel testified that at the time of trial, he had been working for approximately a year as a fleet manager/safety coordinator for a medical transport company, earning $55,000 per year. He received health insurance for him and the children through his employer. Prior to working for the medical transport company, he worked for an auto dealership in Norman, Oklahoma, from 2012 to 2013 (months not specified). His W-2s from the auto dealership showed that he earned $17,040.20 in 2012 and $30,578.90 in 2013. During the time he worked in Oklahoma, either every week or every other week he traveled back to Lincoln, Nebraska, where his mother cared for the parties' children during the week.

Samuel testified that prior to working at the auto dealership in Oklahoma, he worked at an auto dealership in Farmington, New Mexico, from December 2011 to August 2012. During that time, the children stayed with his mother in Lincoln, and Samuel flew to Lincoln once every two weeks. His W-2s showed that he earned $12,719.43 from the New Mexico dealership in 2011 and $106,518.14 in 2012. Prior to the position in New Mexico, Samuel worked for 3 years for an auto dealership in Lincoln; his W-2 for 2011 showed he earned $88,169.76 from the dealership that year. Samuel testified he worked for a dealership in Omaha, Nebraska, prior to working in Lincoln; however, the record does not disclose his earnings there.

Samuel's income tax returns for 2011, 2012, and 2013 were received in evidence. They showed gross income of $100,889 in 2011; $123,558 in 2012; and $61,988 in 2013. A summary of Samuel's monthly living expenses received in evidence showed expenses totaling $4,107.

Samuel testified he had received offers of employment from businesses in other states, including Nevada, New Mexico, Oklahoma, and Georgia, but he had not accepted any of them. When asked if he had plans to move out of state, he testified he had "to finish this court battle first." Samuel explained he was not willing to travel to an out-of-state job as he had done in the past until "this thing is set in stone . . . and done legally."

At the conclusion of trial, the court took the matter under advisement. On August 13, 2014, the court entered a decree of dissolution of marriage and a parenting plan. The court granted legal and physical custody of the children to Samuel. As set forth in the parenting plan, Kathryn was granted 4 days of parenting time every other week during the school year, and parenting time on an alternating week basis during the summer. The court ordered Kathryn to pay child support of $172 per month, which was a downward deviation from the guideline amount but was "specifically approved by the Court based on the summer visitation schedule set forth in the Parenting Plan." In addition to child support, Kathryn was ordered to pay 25 percent of any uninsured medical expenses exceeding $480 per child per calendar year. The court also ordered Samuel to pay alimony of $500 per month for 60 months. No reasons were provided by the court to explain the basis for either the amount or duration.

The court attached child support worksheets to the decree, which we briefly summarize as they are at issue on appeal. For all of the calculations in the worksheets, the court used a gross monthly income of $10,000 for Samuel and $2,253 for Kathryn. Using worksheet 1, the sole custody worksheet, the court calculated Kathryn's guideline child support obligation for two children to be $522 per month. Using worksheet 3, the joint physical custody worksheet, the court calculated Samuel's guideline child support obligation for two children to be $881 per month; as the court later explained, this represented Samuel's child support obligation during the 3 summer months when the parties had equal parenting time.

The court also completed worksheet 5, showing the court's deviations from the guideline amount of child support. The court included two deviations: (1) a deviation of $220 representing a credit for Samuel's child support obligation during the 3 summer months, averaged over 12 months (in other words, the court multiplied $881 by 3 months and divided the result by 12 months to calculate a credit to Kathryn of $220 per month) and (2) a deviation of $130 representing a credit for Kathryn's lack of a child support obligation during the 3 summer months (in other words, the court multiplied Kathryn's guideline amount of support by 3 months and divided the result by 12 months to calculate a credit to Kathryn of $130 per month). The end result was that Kathryn's child support obligation was $172 per month (i.e., $522 - $220 - $130 = $172).

On August 22, 2014, Samuel filed a motion for a new trial or, alternatively, to amend the decree. Samuel argued that in calculating child support, the court improperly used his 2012 income rather than his current income. He further argued the court failed to comply with the child support guidelines when it made "parenting time adjustments" based on the summer parenting schedule. Samuel also argued the court's award of alimony was inequitable in amount and duration.

On October 7, 2014, the court denied Samuel's motion for new trial or, alternatively, to amend the decree. The court found that it properly determined Samuel's earning capacity in calculating child support. The court stated it "did not find believable the substantial reduction in income [Samuel] claims to have occurred or that it will continue to occur in the future." The court also found that its alimony award was appropriate, although it offered no explanation.

The court also explained why it deviated from the guidelines in determining child support. It explained that although it granted Samuel custody of the children, the parents had equal parenting time during the summer. The court stated that "[f]ailing to recognize the adverse economic impact on the mother from the summer parenting schedule would not be in the best interest of the children." The court stated the summer parenting schedule was similar to joint physical custody and that Samuel would owe Kathryn a significant amount of support during the summer months using a joint custody calculation. The court explained that, "[r]ather than deviating in the mother's child support, the court could have ordered the mother to pay her child support obligation for nine months and the father to pay his for three months." However, the court reasoned, "calculating a deviation seemed to be the better approach." Samuel timely appealed to this court.

## ASSIGNMENTS OF ERROR

Samuel assigns as error that the district court abused its discretion in (1) its award of child support by using an improper calculation and deviation from the Nebraska Child Support Guidelines; (2) determining his income for purposes of child support by using an earning capacity based on figures from his highest earning year, when he was consistently traveling and staying out of state for his job; (3) ordering him to pay alimony in an amount that was inequitable given his current income; and (4) ordering him to pay alimony of $500 per month for 60 months given the circumstances of the parties, the prolonged dissolution proceedings, and his current income.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v.*

*Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

ANALYSIS

*Deviation From Child Support Guidelines*.

In support of his first assignment of error, Samuel argues the court abused its discretion by combining sole and joint custody calculations to determine Kathryn's child support obligation. He contends the court's deviation from the guideline amount of child support "is rooted in the erroneous assumption that . . . it could have applied a joint custody calculation [during the summer months], even though it granted [Samuel] full custody." Brief for appellant at 13. According to Samuel, rather than combining sole and joint custody calculations, the court should have applied Neb. Ct. R. § 4-210 and reduced Kathryn's child support payments by up to 80 percent during the summer months. Kathryn did not file a brief; her position on any issues raised by Samuel are unknown.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013); Neb. Ct. R. § 4-203 (Rev. 2011). In determining the amount of child support, a trial court may consider the status and situation of the parties, including their financial condition. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). A court may deviate from the guidelines if it finds their application in a given case would be unjust or inappropriate. *Anderson, supra*; § 4-203(E). A court must specifically find that a deviation is warranted based on the evidence and state the reason for the deviation in the decree, or complete worksheet 5 showing the deviations and include it in the court file. *Anderson, supra*; § 4-203. "Deviations must take into consideration the best interests of the child." § 4-203.

To address Samuel's argument, it is helpful to again summarize how the court calculated Kathryn's child support obligation. Using worksheet 1 (sole custody worksheet), the court calculated Kathryn's guideline child support obligation to be $522 per month. Using worksheet 3 (joint physical custody worksheet), the court calculated Samuel's child support obligation to be $881 per month. The court reasoned that since the parties had equal parenting time during the summer months, it could order Samuel to pay child support of $881 per month during the 3 summer months. Then, instead of ordering Kathryn to pay $522 per month in child support for 9 months and ordering Samuel to pay $881 per month in child support for 3 months, the court granted credits to Kathryn for (1) the $881 per month Samuel would owe her for the 3 summer months (a total of $2,643 or approximately $220 per month for 12 months) and (2) the $522 per month Kathryn would not be obligated to pay for those 3 summer months (a total of $1,566 or approximately $130 per month for 12 months). The net result was that Kathryn owed child support of $172 per month ($522 - $220 - $130 = $172). Or another way to look at what the court did is to simply take Kathryn's obligation of $522 x 9 months ($4,698) minus Samuel's obligation of $881 x 3 months ($2,643); this results in Kathryn's total annual obligation being $2,055 ($4,698 - $2,643) or $171.25 per month.

- 5 -

We agree with Samuel that the calculations the court deemed "deviations" from the guidelines were not authorized deviations. The court combined sole and joint physical custody child support calculations in a manner not provided for in the guidelines. In essence, the court used a sole custody calculation for 9 months of the year and a joint physical custody calculation for 3 months of the year, then averaged the results over 12 months to arrive at Kathryn's final monthly child support obligation. As Samuel argues, the propriety of the child support award depends upon whether the court abused its discretion by combining sole and joint physical custody calculations in this manner; we conclude it did abuse its discretion.

The Nebraska Child Support Guidelines contain specific provisions outlining when the joint physical custody worksheet should be used to calculate child support. The guidelines provide that "[w]hen a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that support shall be calculated using worksheet 3 [the joint custody worksheet]." Neb. Ct. R. § 4-212 (Rev. 2011). They further provide that "[w]hen a specific provision for joint physical custody is ordered and one party's parenting time is 109 to 142 days per year, the use of worksheet 3 to calculate support is at the discretion of the court." § 4-212. Further, "[i]f child support is determined under this paragraph, all reasonable and necessary direct expenditures made solely for the child(ren) such as clothing and extracurricular activities shall be allocated between the parents, but shall not exceed the proportion of the obligor's parental contributions (worksheet 1, line 6)." § 4-212. The mandatory allocation of reasonable and necessary expenditures is an important aspect of using the joint physical custody calculator. Because joint physical custody is premised on a fairly equal sharing of parenting time throughout the year, it results in the fixed monthly child support obligation being significantly reduced. However, that lower monthly obligation is then supplemented by the mandatory sharing of reasonable and necessary expenditures incurred by the children.

As set forth above, § 4-212 refers in two places to its application to orders which contain a "specific provision for joint physical custody." However, this court and the Nebraska Supreme Court have held that, in limited circumstances, the absence of such a specific provision does not preclude the use of the joint physical custody worksheet. See *Patton v. Patton*, 20 Neb. App. 51, 818 N.W.2d 624 (2012) (summarizing these cases, including *Elsome v. Elsome*, 257 Neb. 889, 601 N.W.2d 537 (1999), which held that if joint physical custody is proven, the joint custody worksheet should be used). In *Patton, supra*, the decree of dissolution and parenting plan provided for joint legal custody, with primary physical possession with the mother. The father was granted approximately 160 days of parenting time per year. The trial court used the joint physical custody worksheet to calculate child support and allocated between the parties all reasonable and necessary direct expenditures made solely for the children, such as clothing, schooling, extracurricular activities, or school-related expenses. On appeal, this court held that although there was no specific provision for joint physical custody, it was not an abuse of discretion to use the joint physical custody worksheet to calculate child support, given that the father had parenting time "roughly 45 percent of the year" and the parents shared in all reasonable and necessary direct expenditures made for the children. *Id.* at 64, 818 N.W.2d at 635.

The case before us is distinguishable from *Patton, supra*. Based on our calculations, Kathryn will have parenting time approximately 119 days per year between summer and regular alternating week parenting time compared to the father's 160 days in *Patton, supra*. To calculate

Kathryn's summer parenting time, we note that the parenting plan provides that "summer" starts 7 days after the last day of school and ends 7 days before the start of school. Both children attend Lincoln Public Schools (LPS), and using the LPS school calendars for calendar year 2015, "summer" for purposes of the parenting plan is 70 days long (May 28 to August 5), or 10 weeks. Using the rotating weekly summer schedule, Kathryn will have the children approximately 35 days during the summer (70 ÷ 2 = 35), or 5 weeks. For the other 42 weeks of the year, Kathryn will have the children every other week for 4 overnights or approximately 84 days (21 weeks x 4). Kathryn's total parenting time amounts to 119 days plus some holidays which may or may not overlap with regularly scheduled parenting time. This amount of time is not appreciably different from a "'typical'" parenting time schedule, see *Pool v. Pool*, 9 Neb. App. 453, 458, 613 N.W.2d 819, 824 (2000) (describing as "'typical'" a schedule providing for noncustodial parenting time every other weekend, one additional weekend day a month, two evenings a week, and during the summer from June 1 to July 31), and is significantly less parenting time than the father had in *Patton, supra*. Additionally, Kathryn's 5 weeks of summer parenting time is only one week greater than proposed for noncustodial parents in the local rules for Lancaster County where 2 consecutive weeks are provided early in the summer and 2 consecutive weeks later in the summer. See Rules of Dist. Ct. of Third Jud. Dist., Appendix Form 3 (rev. June 23, 2010). Finally, as previously discussed, using the joint physical custody calculator contemplates a sharing of miscellaneous expenses. The decree in this case contains no provision requiring Kathryn to pay her proportionate share of all reasonable and necessary direct expenditures for the children, such as clothing and extracurricular activities. Other than child support, the only child-related expense Kathryn was ordered to pay was 25 percent of any uninsured medical expenses exceeding $480 per child per calendar year. Given that sole legal and physical custody was awarded to Samuel, and given these significant distinctions from *Patton, supra*, this is not a case where the joint physical custody worksheet could be used to adjust child support for Kathryn's 5 weeks of summer parenting time. Rather, the guidelines provide a mechanism to reduce a noncustodial parent's child support obligation during larger blocks of continuous parenting time, as discussed next.

Kathryn's child support obligation during the summer months can be reduced pursuant to § 4-210, which states in part:

> an adjustment in child support may be made at the discretion of the court when visitation or parenting time substantially exceeds alternating weekends and holidays and 28 days or more in any 90-day period. During visitation or parenting time periods of 28 days or more in any 90-day period, support payments may be reduced by up to 80 percent.

Kathryn's summer parenting time schedule meets this threshold. As previously discussed, Kathryn was awarded 35 out of the 70 days comprising the summer of 2015. Consistent with the district court's goal of maximizing reductions in Kathryn's child support over the course of June, July and August, an 80 percent reduction would be the maximum reduction available under this rule. Application of § 4-210 would result in Kathryn owing only $104.40 per month ($522 x .20) during those summer months. However, to remain consistent with the district court's goal of allocating the reduction over the course of the year, rather than paying $522 per month from September through May, and $104 per month from June through August, Kathryn's child support obligation is calculated to be $418 per month ($4,698 for September through May plus $417.60 for June

- 7 -

through August; total of $5,011.12 ÷ 12 = $417.59). Kathryn's child support for two children is therefore modified to reflect a monthly obligation of $418 commencing August 13, 2014 (date of entry of decree). Child support for one child shall be $314, which we calculated by using the guideline amount of $392 and reducing it by 80 percent for June through August, then allocating the reduction over the course of the year ($3,528 for September through May plus $235.20 for June through August; total of $3,763.20 ÷ 12 = $313.60).

Based on the foregoing, we conclude the district court abused its discretion when it deviated from the child support guidelines in the manner it did, which in essence was by using sole custody calculations for the school year and joint physical custody calculations for the summer instead of applying the reduction permitted pursuant to § 4-210. Accordingly, Kathryn's child support obligation is modified as set forth herein. In determining the modified child support, we have relied upon the income figures used by the district court because we conclude there was no abuse of discretion in the court's determination of income attributable to each party. We explain why next.

*Income for Purposes of Child Support.*

Samuel also argues the court abused its discretion in basing its child support calculation on his earning capacity rather than his actual, current income. He contends there was no evidence he was "capable of realizing a higher earning capacity through reasonable effort while maintaining custody of the parties' two (2) minor children." Brief for appellant at 14. He points out that the court based his earning capacity on his income from positions that "required significant out of state travel that was incompatible with [his] responsibilities as a parent with legal custody of two minor children." Brief for appellant at 14. According to Samuel, Kathryn presented no evidence that he "could earn a high income in any job in Nebraska." Brief for appellant at 15. He asserts his current job is the "only job [he] could secure while caring for [his children]." Brief for appellant at 15.

The Nebraska Child Support Guidelines provide that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources." Neb. Ct. R. § 4-204 (Rev. 2008). "Use of earning capacity to calculate child support is useful 'when it appears that the parent is capable of earning more income than is presently being earned.'" *Freeman v. Groskopf*, 286 Neb. 713, 720, 838 N.W.2d 300, 307 (2013), quoting *Rauch v. Rauch*, 256 Neb. 257, 590 N.W.2d 170 (1999). Likewise, child support may be based on a parent's earning capacity when a parent voluntarily leaves employment and a reduction in that parent's support obligation would seriously impair the needs of the children. *Claborn v. Claborn*, 267 Neb. 201, 673 N.W.2d 533 (2004). Generally, however, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015).

We conclude the district court did not abuse its discretion in determining that Samuel's earning capacity was $10,000 per month, or $120,000 per year. As Samuel points out, $120,000 was his approximate annual income for 2012, when he worked at auto dealerships in Oklahoma and New Mexico. Samuel's actual annual income at the time of trial was only $55,000, which he earned working as a fleet manager/safety coordinator at a medical transport company in Lincoln.

Although Samuel's current income was significantly lower than $120,000, Samuel testified he had received a number of job offers, which he had declined. While those offers were out of state, Samuel's testimony implied he would pursue similar offers in the future. When asked if he had plans to move out of state, he testified he had "to finish this court battle first" and explained he was not willing to travel to an out-of-state job as he had done in the past until "this thing is set in stone . . . and done legally." The implication was that once the "court battle" was over, he would return to a job similar to the jobs he had in the past. We also note that the district court was in the best position to judge the witness' credibility. See *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015) (although an appellate court's review in dissolution cases is de novo, if credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts than another).

Samuel also contends that his current job is the "only job [he] could secure while caring for [his children]" and that there was no evidence presented that he "could earn a high income in any job in Nebraska." Brief for appellant at 15. However, Samuel ignores that as recently as 2011, he earned $88,169.76 working part of the year at an auto dealership in Lincoln (he left his job in Lincoln and began working for the New Mexico dealership in December 2011). Samuel testified he worked for the Lincoln dealership for 3 years and for a dealership in Omaha prior to that. Therefore, the evidence does not support his contention that work similar to his out-of-state positions is unavailable in Nebraska. Likewise, while Samuel argues on appeal that an out-of-state position is "incompatible with [his] responsibilities as a parent with legal custody of two minor children," brief for appellant at 14, we note that he had sole physical custody of the children when he was working for the dealerships in Oklahoma and New Mexico.

We also note that in arguing the court abused its discretion in relying on his earning capacity rather than his actual income, Samuel ignores that the monthly income the court used for Kathryn when calculating child support was significantly higher than any income she had earned on an annual basis for the prior 3 years. The court determined Kathryn's monthly income to be $2,253, which works out to $13 per hour for 40 hours per week and $27,036 per year. At trial in April 2014, Kathryn testified she had begun working for a temporary employment agency in March 2014, earning $13 per hour for between 32 and 40 hours per week. Her next most recent position was working as a "forklift tech" for a company in Blair; however, that position ended on August 1, 2013. Her W-2 from the company in Blair showed she earned $15,795.50 in wages in 2013; she also received $2,064 in unemployment compensation in 2013. Her income tax returns for 2012 and 2011 showed gross income of $20,349 and $8,679, respectively.

Therefore, while the district court based its child support calculation on an earning capacity that was significantly higher than Samuel's current income, it also used an income figure for Kathryn that, on an annual basis, was significantly higher than her annual income in any of the prior 3 years. Notably, we completed the sole custody worksheet using Kathryn's highest actual annual income of $20,349 and Samuel's actual income of $55,000, and the result was that Kathryn owed Samuel child support of $531 per month, substantially similar to the $522 figure the court reached using higher income figures for Kathryn and Samuel. We need not address the effect that using the higher income figures had on Samuel's child support obligation using the joint physical

custody worksheet, since we have modified the child support using § 4-210 rather than a joint physical custody worksheet.

*Alimony.*

Samuel next argues the court abused its discretion in ordering him to pay $500 per month in alimony for 60 months. He has two assignments of error related to alimony and two sections of argument in his brief; however, the assignments of error and arguments are related, so we address them together. Samuel argues the alimony award was inequitable given his current income, the length of the parties' separation, and the parties' circumstances. He contends he has been "forced to give up his career in the auto service industry and take substantially lower paying employment in Lincoln," brief for appellant at 16, and that Kathryn has had "ample opportunity to make herself available for employment or receive proper training for employment." Brief for appellant at 17. He also notes he paid $500 per month in alimony for approximately 12 months following the prior decree of dissolution of marriage that was vacated and which had ordered alimony for 3 years (Kathryn testified Samuel stopped paying alimony in June 2012, and the prior decree was entered in July 2011).

Under Neb. Rev. Stat. § 42-365 (Reissue 2008), courts should consider four factors relative to alimony: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. Courts should also consider the income and earning capacity of each party, as well as the general equities of the situation. *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015). The main purpose of alimony is to assist a former spouse for a period necessary for that individual to secure his or her own means of support; reasonableness is the ultimate criterion. *Id*. In reviewing an alimony award, an appellate court does not decide whether it would have awarded the same amount of alimony as the trial court, but instead whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id*.

As an initial matter, we have already addressed Samuel's argument that the court abused its discretion in determining that his earning capacity was $120,000 per year. As we explained above, the court did not abuse its discretion in relying on that figure for purposes of calculating child support. For the same reasons, it did not abuse its discretion in using that figure when determining an appropriate amount of alimony. We find no abuse of discretion in the amount of monthly alimony ordered. We consider next the duration of the award.

Samuel's remaining arguments focus on the consideration that at the time of trial, it had been nearly 5 years since the parties separated, during which period Kathryn had the ability to establish her own means of support. We are also mindful that the parties were married in 2000, separated in 2009, and were initially divorced in July 2011. The 3-year alimony award in the since-vacated Sarpy County decree has now, 3 years later, been replaced with a 5-year alimony award that seems to give no credit for the roughly 1 year of alimony Samuel appears to have paid following entry of the July 2011 decree. While there is a sense of inequity in the duration of this alimony award, especially considering Samuel has full custody of the children and a previous district court determined 3 years was an appropriate duration for alimony, this court is limited to

reviewing the district court's decision for an abuse of discretion. With that in mind, we consider the facts presented in the record before us.

The summary of Kathryn's monthly living expenses received in evidence showed expenses of between $2,272 and $2,372, including her $500 temporary child support obligation. While the district court set child support at only $172, we have modified the child support award to $418 per month. Using the revised amount of child support and adding that amount to her other stated monthly obligations, Kathryn's monthly expenses are between $2,190 and $2,290. Using the income figure that the district court used in calculating child support, Kathryn's net income after taxes is $1,853.77. Therefore, Kathryn's net income of $1,853.77 is not enough to meet her monthly expenses of between $2,190 and $2,290.

Furthermore, as the district court determined, Samuel has a substantially higher earning capacity than Kathryn. Using the earning capacity determined by the trial court, Samuel's net income after taxes is $7,149, and he will receive child support in addition to the income he receives from employment. His monthly living expenses total $4,107.

We also note that although the evidence does not disclose the parties' employment history for the entire length of the marriage, it revealed that for the 3 years ending December 2011, Samuel worked for an auto dealership in Lincoln; prior to that, he worked for a dealership in Omaha. By contrast, Kathryn testified she operated an in-home daycare until 2006 and at the time the parties separated in September 2009, she was unemployed. Therefore, it is clear that Samuel was the primary source of the parties' financial support during the marriage, which leads to the reasonable inference that Kathryn is in need of alimony for a period of time to secure her own means of support. Although 5 years of alimony is perhaps a longer duration than we might typically see for a 9-year marriage (separated in 2009), we cannot say it was an abuse of discretion for the district court to enter such an award given the large disparity in earning capacity and Kathryn's lack of sustained employment history. However, we do find that it was an abuse of discretion to not credit Samuel for the 12 months of alimony he paid in accordance with the since-vacated 2011 decree, which decree did not require Kathryn to pay child support to Samuel even though he was at that time awarded physical custody of the children. During that 1-year period in which Kathryn was receiving alimony and not paying child support, she had the full benefit of alimony assistance while attempting to transition into gainful employment. It was an abuse of discretion by the district court to not credit Samuel for alimony previously paid. Accordingly, we modify the alimony award's duration from 60 months to 48 months.

## CONCLUSION

For the foregoing reasons, we modify the district court's child support award to $418 per month as set forth herein, and we modify the duration of the alimony award from 60 months to 48 months. We otherwise affirm the judgment of the district court as modified.

AFFIRMED AS MODIFIED.